GERALD L. LOONEY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Looney v. Commissioner
Docket Nos. 6850-86; 8688-86; 8689-86; 8690-86; 19873-86.
United States Tax Court
T.C. Memo 1988-332; 1988 Tax Ct. Memo LEXIS 360; 55 T.C.M. (CCH) 1376; T.C.M. (RIA) 88332; July 27, 1988; As amended August 19, 1988 *360 Ps leased children's master recordings from J in transactions that can be characterized as "generic tax shelters". Held, applying an objective analysis, the transactions lacked economic substance apart from anticipated tax benefits. Rose v. Commissioner,88 T.C. 386 (1987). Held further, (1) Ps are liable for additions to tax pursuant to sections 6653(a), I.R.C. 1954. (2) Ps are liable for the addition to tax pursuant to section 6659, I.R.C. 1954. (3) Ps, in docket numbers 6850-86, 8688-86, 8689-86, and 8690-86 are liable for additions to tax under section 6661 after appropriately reducing the understatement by the amount subject to the addition under section 6659. (4) Ps are liable for the increased rate of interest provided in section 6621(c), I.R.C. 1986. (5) R is not awarded damages under section 6673, I.R.C. 1954. Walter Tribbey, for the petitioners. Deborah A. Butler and Rebecca Wolfe, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to the provisions of section 7456(d)(3) of the Code (redesignated section 7443A(b)(3) by section 1556 of the Tax Reform Act of 1986, Pub. *361 L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: Respondent determined the following deficiencies in, and additions to, petitioners' [3] Federal income tax liability: Petitioner
Year
Deficiency
Gerald L. Looney
1979
$  1,553.00
6850-86
1982
13,571.50
1983
1,853.00
Gordon Hall
1979
7,553.06
8688-86
1980
8,562.19
1981
10,065.75
1982
11,815.00
1983
7,452.00
George M. and Gloria
1980
39,305.00
E. Wolfe 8689-86
1983
16,797.00
Howard V. and Amy H.
1979
8,522.00
West 8690-86
1980
12,645.00
1981
4,789.00
1982
26,419.00
John W. and Gina Y.
1980
2,521.00
Powers 19873-86
1981
4,838.00
1983
3,535.00
Additions to Tax
Section
Section
Section
Petitioner
6653(a)(1)
6653(a)(2)
6659(a)
Gerald L. Looney
$    77.65
*
$   465.90
6850-86
678.55
*
4,071.30
92.65
*
555.90
Gordon Hall
377.65
*
2,265.91
8688-86
428.10
*
2,568.65
503.28
*
3,019.72
590.75
*
3,544.50
372.60
*
2,235.60
George M. and Gloria
1,965.25
*
11,791.50
E. Wolfe 8689-86
839.85
*
5,039.10
Howard V. and Amy H.
426.10
*
2,556.60
West 8690-86
632.25
*
3,793.50
239.45
*
1,436.70
1,320.95
*
7,925.70
John W. and Gina Y.
126.05
*
756.30
Powers 19873-86
--
--
1,451.40
176.75
*
1,060.50
*362 Respondent also determined that all underpayments in tax for each year in issue are substantial underpayments attributable to tax-motivated transactions under the provisions of section 6621(c) [formerly section 6621(d)]. [4]
In Amendments to Answer, respondent asserted additions to tax under the provisions of section 6661. Respondent also claimed damages under the provisions of section 6673 in Amendments to Answer. Petitioners leased children's master sound recordings from Jarelco, Inc. (Jarelco). The issues for decision [5] *364 *363 are: (A) Whether the Jarelco master recording lease venture is a generic tax shelter subject to the unified objective analysis formulated in Rose v. Commissioner,88 T.C. 386 (1987); (B) Whether the venture lacked economic substance and should consequently be disregarded for tax purposes; (C) Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a); (D) Whether petitioners are liable for additions to tax under section 6659(a); (E) Whether petitioners are liable for additions to tax under section 6661; (F) Whether petitioners are liable for the increased rate of interest provided in section 6621(c); and (G) Whether damages should be awarded to respondent under section 6673. FINDINGS OF FACT Some of the facts have been stipulated. This reference incorporates the stipulation of facts and attached exhibits. Background of the promotion
Jarelco, Inc. (Jarelco) purchased children's master recordings (the masters) from Oriolo Educational Publications, Inc. (OEP), which produced the masters. [6] Jarelco then leased the masters to petitioners to package, market, and distribute. The purchase of the masters created investment tax credits which Jarelco passed to the petitioners bases upon a value of not less than $ 195,000 per master. In addition, petitioners amortized lease expenses and deducted distribution costs and miscellaneous expenses, claiming that they were in the business of selling the master recordings. The master audio recordings are various children's stories presented through dialogues of fictitious, cartoon characters and are approximately fifteen minutes in length. Joseph Oriolo and his son, Donald Oriolo, created and developed the characters. Coloring posters *365 depicting one or more of the animated characters were to accompany the recordings. Joseph Oriolo had over 50 years experience in the animation industry. Donald Oriolo's experience includes performing as a studio musician and writing, producing, arranging, recording, and publishing musical compositions. James A. Rumpf was president, sole director, and sole shareholder of James A. Rumpf and Associates, Inc., a Texas corporation in the business of tax advantaged investments. On August 13, 1982, Joseph Oriolo and Donald Oriolo met with Mr. Rumpf and agreed to produce the children's master recordings. It was agreed that Donald Oriolo would form OEP and sell the master recordings to Jarelco, a company which Mr. Rumpf would form. At the meeting, they orally agreed to a uniform purchase price for each master and the structure of payments. [7] The purchase price for each master recording was $ 195,000; Jarelco paid OEP a $ 3,000 cash downpayment, issued a promissory note for $ 192,000, and put a lien on the corresponding master as security for the purchase. The promissory note was payable from 50 percent of the gross revenues that the respective master generated, and was due ten years from *366 the date the note was executed. In last August 1982, Jarelco was incorporated with Mr. Rumpf as its president, sole director, and sole shareholder. OEP was formed in September 1982, with Donald Oriolo as chief executive officer and president. On August 23, 1982, Mr. Rumpf, as president of Jarelco, drafted and signed a letter that memorialized the oral agreement. Donald Oriolo, as chief executive officer of OEP, and Joseph Oriolo, as president of OEP, signed the letter on August 27, 1982. The letter states that the promissory note for each master would be paid out of 50 percent of revenues from commercial exploitation of each master. The letter also states that the promissory note would be nonnegotiable, nonassignable, and nontransferable in nature and could not be used as security. Initial funding of Jarelco was stated to be between $ 10,000 and $ 50,000. The documents for purchase and sale of each individual master included these samples: (a) a purchase agreement between OEP (seller) and Jarelco (purchaser); (b) a promissory note between OEP (payee) and Jarelco (maker); (c) a security agreement between *367 OEP (secured party) and Jarelco (debtor). These documents were included in the information memorandum distributed to investors. Each promissory note from Jarelco (maker) to OEP (payee) provides for security for payment to OEP. The security was stated to be a lien upon the masters. Jarelco promised to insure the masters against loss from fire, theft, or other destruction. Jarelco promotional materials
The promotional materials that petitioners received emphasized the expected tax benefits from leasing children's master recordings. The beginning of the promotional materials stated the following: NOTICE * * * * * * the lessee must have knowledge and experience in financial and business matters, or utilize a financial advisor with such knowledge and experience, such that they are capable of evaluating the merits and risks of leasing, manufacturing and distributing a master * * *. [Emphasis added.] The materials included a one-page worksheet so that prospective investors could figure their Federal income tax savings. A "tax consideration" section projected tax write-offs of at least 3.8 to 1, and, in 1982, stated that a $ 10,000 purchase would result in a write-off of $ 41,667. The *368 materials contained a tax opinion which warned prospective investors of the "* * * substantial likelihood that the [Internal Revenue] Service will label this transaction as an abusive tax shelter * * *." The tax opinion also warned that a lessee might be required to prove affirmatively the fair market value of the master or the intent to make a profit. Blanket appraisals of the masters were included in the material. Jarelco provided a suggested check list to each appraiser which outlined the items to be covered and included in each of the standardized appraisals. Jarelco investors
The Jarelco master recording leasing program was promoted nationally. Petitioners leased their master recording interests from Jarelco through Balanced Financial Services, Inc. (BFM) which received a commission from Jarelco for each master recording interest leased. [8]Managed Accounting Services, Inc. (MAS), [9] *369 a related accounting service company which BFM formed, performed the accounting, statistical, and tax preparation services for BFM, its clients, and its agents. Petitioners had no experience or expertise in the master recording industry. Before investing in the Jarelco program, none of the petitioners listened to the master recordings they leased or examined appraisals for the master recordings. Further they did not seek independent appraisals for those masters or obtain expert advice about the economic viability of the Jarelco promotion or the merits of leasing master sound recordings. Maria Mutschler, one of a group who BFM retained to promote the Jarelco program on a commission basis, [10] introduced petitioner Gerald L. Looney (Looney), a physician, to Jarelco. Looney attended a Jarelco promotional seminar, reviewed a copy of the promotional materials, and, relying on Maria Mutschler's advice, invested in Jarelco in 1982. Without any subsequent investigation, he also invested in 1983. In 1982, petitioner Howard V. West (West), a CPA, attended a number of Jarelco promotional events. West invested in 1982 *370 and subsequently became a commissioned salesman for the program. In 1982, petitioner West introduced petitioner Gordon Hall (Hall), an accountant, to Jarelco. Hall attended several Jarelco seminars held at BFM's offices, reviewed the promotional materials, and contacted a MAS representative about the promotion. After discussing the tax benefits from the program with his accountant, Hall invested in 1982 and, without any further investigation, again in 1983. At the time of his investment in Jarelco in 1983, petitioner George M. Wolfe was a Divisional Manager for Data Design Laboratories. [11]
Petitioner John W. Powers (Powers) was an oil field technician in 1983 when he attended a Jarelco promotional seminar. After subsequent conversations with Maria Mutschler, Powers decided to invest in Jarelco in 1983. Selection and leasing of master recordings
After investing in the Jarelco program, the petitioners determined the particular master recordings to be leased. However, the investors did not listen to the selected masters prior to leasing them. Those who leased a partial interest in the Jarelco masters, less than 100 percent, were given *371 a master chosen to match the percentage interests purchased with interests available from other partial leases. Consequently, at the time of their investment, partial interest holders in Jarelco masters did not know the identity of the remaining interest holders in those same masters. Jarelco leased 576 master recordings in 1982 and 1,272 master recordings in 1983. The following chart indicates the master titles and the percentage interest which petitioners leased in 1982 and 1983: Petitioner
Year
Title of master leased
% leased
Looney
1982
George Washington Bridge
62.5
1983
Penny Pitching
50.0
Hall
1982
Big Brass
37.5
1982
Water Roads
100.0
1983
Puppy Love
60.0
Wolfe
1983
Teaching Was Supposed To Be Easy
100.0
1983
The Big Build Up
100.0
West
1982
Dewey Or Don't We
100.0
1982
Big Foot and Little Inch
100.0
1982
Weigh Out
100.0
Powers
1983
George Mikan, The Once Big Man
40.0
To lease a master recording interest from Jarelco, each petitioner signed a lease agreement which was not negotiated. The lease agreements conveyed the right to commercially exploit the corresponding master recordings for six years. [12] Petitioners were required to pay Jarelco both a fixed amount at the beginning of each lease ($ 10,000 in 1982 and $ *372 12,000 in 1983), plus 80% of all gross revenues that the masters generated. From the remaining 20% of gross revenues, petitioners were required to pay the costs to manufacture and distribute. In exchange, Jarelco elected to pass any investment tax credit relating to the masters to petitioners. Petitioners participating in the 1982 program claimed investment tax credits based on a value of $ 220,000, and 1983 participants claimed credits based on a value of $ 260,000. Organization and operation
Petitioners who leased Jarelco masters through BFM signed powers of attorney that authorized MAS to manage their Jarelco investments. However, MAS had never produced, manufactured, or distributed master recordings. Nevertheless, petitioners relied exclusively on MAS to manage the Jarelco masters and did not actively monitor their interests. MAS chose Teleproducts Distributing, Inc. (Teleproducts) from a list which Jarelco provided to distribute the Jarelco masters. MAS did *373 not contact or consider distributors other than those which Jarelco suggested. Neither the investors nor MAS negotiated the terms of distribution. Each petitioner signed distribution agreements for their respective interests in the masters. Teleproducts attempted to distribute the Jarelco master recordings leased in 1982 and 1983, a task which it could not manage. Packaging, production, and distribution of the masters was delayed because the inventory and derived products were not in a central location. Additionally, original packaging was so poorly done that the price of the product was drastically reduced [13] and new packaging was designed. Due to the large volume of master recordings, delays in production, and poor packaging, the product failed to attract retailers to sell the Jarelco line of tapes. Consequently, sales were low, Teleproducts' efforts to distribute were unsuccessful, and none of petitioners reported any income from their master recording activities. In 1985, petitioner Hall told MAS that he no longer wanted to retain its services. However, no replacement *374 was hired to manage or distribute his Jarelco investments. In the summer of 1985, Sanders Career School through a subsidiary, SCS Consumer Products (SCS) acquired Teleproducts and purchased its inventory at significantly reduced prices. Without investigating SCS or considering other potential distributors, petitioners Looney, West, and Powers retained SCS to distribute their masters. [14]
SCS than tried to distribute the masters. SCS, however, did not keep books or records of the tapes that were shipped or the income received from an individual title. In addition, the income earned from a shipment of tapes was divided equally among all lessees whose titles were shipped, regardless of actual sales. Appraisals of the master recordings
Mr. Rumpf retained several appraisers to value the masters. Sherwin Raiken submitted a blanket appraisal which purported to set the average fair market value of all Jarelco masters. Mr. Raiken did not value any of the master recordings individually, and the blanket appraisal did not refer to any particular master. Rather, Mr. Raiken simply apprised *375 the master recordings as a group, alleging the value of each master to be at least $ 495,000. Ralph Stein, David A. Gordon, S. Lawrence Sikora, and Jerry Dougherty prepared "secondary" appraisals for the master recordings. One secondary appraisal was submitted for each individual master recording. Each secondary appraiser prepared a form appraisal letter on which the appraiser entered the title or catalog number of the corresponding master. In the appraisal letters, Mr. Stein states the fair market value to be $ 320,000 per master recording. Mr. Gordon states a fair market value of "between $ 375,000 to $ 450,000" per master recording. Mr. Sikora arrived at a fair market value of "not less than $ 495,000" per master. Mr. Dougherty claimed a value of "not less than $ 500,000" per master. The Jarelco promotional materials referred to the blanket and secondary appraisals, and the 1983 promotional materials contained copies of the blanket appraisal letter and the various secondary appraisal letters. Claimed deductions, losses, and credits
Petitioners claimed tax credits and losses, amortized lease expenses, and deducted distribution costs and miscellaneous expenses. With separate *376 deficiency notices, respondent disallowed the claims and determined additions to tax for negligence under sections 6653(a)(1) and (a)(2), and for valuation overstatements under section 6659(a). Respondent further asserts the higher rate of interest provided in section 6621(c) for substantial underpayments of tax attributable to tax motivated transactions. Respondent filed Amendments to Answers and claims damages in these cases pursuant to section 6673. For petitioners Looney, Hall, Wolfe, and West, the amended answers also seek additions to tax under section 6661. OPINION Jarelco purchased children's master recordings with both cash and promissory notes. Jarelco then leased the masters to petitioners to package, distribute, and sell. Jarelco passed the investment tax credits to the lessees who also claimed deductions for the amortization of lease expense, distribution costs, and miscellaneous expenses. It is the judgment of this Court that: (A) The Jarelco master recording venture is a generic tax shelter; (B) The venture, tested under the unified objective analysis formulated in Rose v. Commissioner,88 T.C. 386, lacked economic substance and is disregarded for tax purposes; *377 (C) Petitioners are liable for additions to tax for negligence pursuant to section 6653(a); (D) Petitioners are [Text Deleted by Court Emendation] liable for additions to tax under section 6659(a); (E) Petitioners, in docket numbers 6850-86, 8688-86, 8689-86, and 8690-86 are liable for additions to tax under section 6661; (F) Petitioners are liable for the increased rate of interest provided in section 6621(c); and (G) Respondent is not entitled to damages under section 6673. Ordinary and necessary expenses paid or incurred may be deducted if the venture is carrying on a trade or business or, in the case of an individual, if the activity is carried on for the production of income. Sections 162 and 212(1) and (2). Investment tax credits may be deducted only if the property is depreciable and has a useful life of more than three years. Section 48(a)(1). Depreciation may be deducted only if the property is used in a trade or business or held for the production of income. Section 167(a). To be a trade or business, the taxpayer must engage in the activity with the objective to realize a profit. Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). If *378 an activity is not engaged in for profit, expenses, other than those that are deductible without regard to whether the activity is engaged in for profit, are limited. Section 183(b). They are limited to the amount of income which the activity generates in excess of deductions allowable without regard to whether the activity is one engaged in for profit. Section 183(b). [15] *379 The expectation of making a profit need not be reasonable but the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984). In this context, "profit" means economic profit, independent of tax savings. Seaman v. Commissioner,84 T.C. 564, 588 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). A transaction has no valid business purpose where there exists little reason, apart from the significant tax benefits, for entering into the transaction. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Patin v. Commissioner,88 T.C. 1086 (1987). Whether a transaction is entered to make a profit is a question of fact to be determined from the manner in which the activity *380 is pursued. Allen v. Commissioner,72 T.C. 28 (1979). Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). To analyze whether petitioners are entitled to deduct claimed business expenses, regulations promulgated under section 183 provide a list of factors which may be considered to determine intent to make a profit. Section 1.183-2(b), Income Tax Regs.; [16] *381 Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). This Court, however, has recently formulated a separate analysis that emphasized objective factors. See Rose v. Commissioner, supra. This approach first analyzes whether the venture was primarily organized to generate tax savings and should be deemed a generic tax shelter. See Rose v. Commissioner, supra.If the venture is considered a generic shelter, the venture is then analyzed with objective factors to determine whether it is devoid of economic substance and should be disregarded for tax purposes. See Rose v. Commissioner, supra.
A. GENERIC TAX SHELTER A "generic tax shelter" [17] is a venture possessing some or all of the following characteristics: (1) tax benefits are the focus of the materials used to promote the program; (2) the investors accepted the price and terms of the leases without negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract, and substantially overvalued in relation to the tangible property included as part of the packages; (4) the *382 tangible assets were acquired or created at relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.
In cases having these characteristics, tax motivation is apparent and they are identified as generic tax shelters. See Rose v. Commissioner, supra at 412. BFM representatives first introduced petitioners to the Jarelco master recording lease program. BFM emphasized the tax benefits which petitioners could receive by claiming the investment tax credits. The promotional material for both the 1982 Jarelco program and the 1983 program emphasized the tax benefits, rather than economic potential. Although it is not clear whether all petitioners received the promotional material, the information they did receive focused almost exclusively on the tax aspects of investing in the Jarelco program. Furthermore, petitioners did not negotiate the terms of either the leases *383 or the sales agency agreements. The masters were overvalued and the bulk of the consideration paid for the masters was deferred through the use of promissory notes. Tax savings clearly motivated petitioners to invest in the leases. Accordingly, the Jarelco master recording leases are considered a generic tax shelter subject to the unified objective analysis. See Rose v. Commissioner, supra at 413. Expenses, losses, and credits may be deducted only if petitioners can prove that the venture did not lack economic substance and sufficient business purpose existed. Rose v. Commissioner, supra.
B. ECONOMIC SUBSTANCE AND BUSINESS PURPOSE The unified objective analysis seeks to determine whether a generic tax shelter lacks economic substance. See Patin v. Commissioner, supra. The following objective factors are analyzed: (1) petitioners' investment activities; (2) the relationship between fair market value and price; (3) the structure of the financing; and (4) perceived Congressional intent.
Rose v. Commissioner, supra at 415-422.
1. Petitioners' Investment Activities
Prior to leasing the Jarelco masters, petitioners had no expertise or knowledge of children's audio tape distribution. Petitioners *384 did not independently investigate the economics of the distribution activity. No effort was made to confirm the projected sales or costs contained in the promotional materials. No expert in the children's recording industry was contacted to study the economic viability of the program. In fact, petitioners did not listen to the masters before leasing them. MAS entered into distribution agreements with Teleproducts, Inc. to distribute recordings made from the Jarelco masters. The evidence shows that sales were not sufficient to produce income for petitioners. No evidence was presented on the number of recordings produced from the masters. Petitioners did not ask MAS or Teleproducts why the master recordings were not a commercial success. After Teleproducts' efforts failed, petitioners undertook no independent distribution effort until SCS contacted them. Some petitioners made no attempt to retain SCS as their distributor until the eve of trial. Additionally, there is no evidence that petitioners asked to see the books and records of Teleproducts, SCS, or MAS to review the distribution of the tapes. They did not request an accurate sales history of the tapes derived from their *385 respective masters. Petitioners did not have insurance on the masters and did not require Teleproducts or SCS to carry any insurance. Petitioners spent little time and effort to distribute the masters. The only effort was to sign the lease agreements and distribution agreement and to receive mail from MAS, BFM, Teleproducts, and SCS. Avdik B. Poladian, a certified public accountant, testified as an expert for petitioners. He testified that his firm would charge $ 2,000 to $ 5,000 to review the promotional materials to determine the tax consequences. Mr. Poladian also stated that his firm would not give an opinion of the economic potential. He would advise a potential investor to hire an expert in children's recordings to conduct an economic feasibility study. Based on the amount of money being invested, he stated that it would be unreasonable to expect petitioners to pay for both a tax review and a study of economic potential. Petitioners, however, made no effort to investigate the tax consequences or economic viability. Petitioners clearly should have made some investigation prior to leasing the masters. See Flowers v. Commissioner,80 T.C. 914 (1983).
2. Relationship Between *386 Fair Market Value and Price
Jarelco purchased each of the masters from OEP for a purchase price of $ 195,000 with a cash downpayment of $ 3,000 and a promissory note for $ 192,000. The 1983 Jarelco promotional materials contained letters stating the values of the masters to be from $ 320,000 to $ 500,000. Petitioners claimed investment tax credits based on purported values of $ 220,000 in 1982 and $ 260,000 in 1983. At trial, David Gordon, who the promoters of Jarelco hired to make secondary appraisals, testified for petitioners. In the Jarelco promotional materials his stated value for the masters ranged from $ 375,000 to $ 450,000. At trial, however, he testified that the leased masters had value only in the educational market. He placed a value of $ 30,800 for each master if a teacher's guide accompanied the recordings. His opinion was that the masters had no value without a teacher's guide. No teacher's guide, however, was developed. In fact, petitioners and the distributor never planned to develop such guides. Further, petitioners never attempted to market the Jarelco recordings to teachers or educational institutions. Arthur Denish, a sales manager for Teleproducts, *387 testified that Teleproducts had to "beg" retailers to take the product. Further, he testified that Jarelco overproduced the masters and tried to sell in a saturated market. Respondent's experts, Shelley Miles and Steven Schwartz, examined the market potential of the Jarelco masters. They both noted that the children's recording industry is extremely competitive and has limited avenues of distribution. They determined that the tapes could generate only minimal income and that the cost to produce, package, and distribute the recordings made the venture uneconomic. Mr. Schwartz testified that the stories were not creative and that the quality of the tapes was mediocre. In addition, the Jarelco recordings do not have name recognition or any other attributes which would encourage retailers to stock the recordings and consumers to buy them. Consequently, he valued the replacement cost of the masters at between $ 500 and $ 3,000. In the expert opinion of Ms. Miles, the replacement value of the masters is from $ 1,500 to $ 5,000. According to Ms. Miles, petitioners could not reasonably expect significant sales, regardless of the marketing efforts that might have been made. The opinions *388 of experts are admissible and relevant to the issue of value, but the opinions are weighed according to the expert's qualifications and other relevant evidence. See Johnson v. Commissioner,85 T.C. 469, 477 (1985). This Court may reject expert testimony if judged appropriate to do so. See Helvering v. National Grocery Co., 3004 U.S. 282 (1938); Chiu v. Commissioner,84 T.C. 722 (1985). Respondent's experts were thorough and professional. Their appraisals were performed with adequate care and are reasonably accurate. The fair market values of the Jarelco masters bear no relationship to the values which petitioners claimed for the investment tax credits. Nor do the values of the leases of the masters bear reasonable relationships to the costs of the leases.
3. Structure of the Financing
Deferred debt that is in substance or in fact not likely to be paid lacks economic substance. Knetsch v. United States,364 U.S. 361 (1960); Rose v. Commissioner, supra at 419; Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). The substance, not the form, of such debt is examined. *389 Waddell v. Commissioner, supra.
Although no notes were created at the investor level, Jarelco calculated the investment tax credits based on the inflated purchase price. Jarelco subsequently elected to pass the investment credit to petitioners. The purchase price for each master that Jarelco paid to OEP was $ 195,000, with a $ 3,000 cash payment and a ten year recourse note for $ 192,000. The total face value of the promissory notes signed on behalf of Jarelco for the purchase of the masters is approximately $ 355,000,000 with simple interest at nine percent per annum. Interest of approximately $ 320,000,000 is stated to be due and owing in 1992 and 1993 for a total purported debt of approximately $ 675,000,000. Although OEP apparently had full recourse against Jarelco under the terms of the notes, the only notable assets were the masters themselves. When the notes were executed, Jarelco was newly incorporated with initial capital of between $ 10,000 and $ 50,000. The lease agreements provided that payments on the notes were to be made to OEP from fifty percent of the gross profits. There is no evidence that any payments were made on behalf of the petitioners under the terms *390 of the notes and lease agreements. It is clear that the ten year notes would not be paid and that Jarelco or OEP never contemplated payment. The promissory notes in these cases lack economic substance. The masters were negotiated solely to inflate investment tax credits and Jarelco could not have intended to repay those notes. Under such circumstances, the notes are nonrecourse in substance, if not in form. See Vastola v. Commissioner,84 T.C. 969 (1985).
4. Perceived Congressional Intent
Petitioners made no showing that Congress intended to encourage investment in the type of activities and transactions involved in these master recordings. See Rose v. Commissioner, supra at 421-422. Tested with the unified objective analysis, petitioners' master recording activity lacks economic substance and is disregarded for Federal income tax purposes. Petitioners have failed to prove that they had a bona fide intent to make a profit. They only invested in the tax shelter to claim the tax benefits which were in no way related to the fair market value of the leased masters. See Rose v. Commissioner, supra at 419. Petitioners leased the master sound recordings based on inflated values and *391 were immediately placed at a tremendous disadvantage. To make a profit, the masters had to generate revenues far in excess of what they feasibly could produce. See West v. Commissioner,88 T.C. 152, 161 (1987); Brannen v. Commissioner, supra at 508. Accordingly, petitioners are not entitled to claim deductions, losses, or investment tax credits. The deduction disallowance extends to the cash payments, including lease payments. Such payments merely represent a fee which petitioners paid to purchase tax benefits and, consequently, may not be deducted. Patin v. Commissioner, supra at 1125.
C. SECTION 6653(a) ADDITION TO TAX An addition to tax equal to 5 percent of the underpayment is imposed if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(1). In addition, section 6653(a)(2) provides for an addition to the tax of an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners *392 bear the burden of proof to show due care. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). While petitioners claimed to have engaged in the commercial development of master recordings, they had no experience in the industry and paid little attention to their investment. They did not seek advice about the propriety or financial merit of leasing the master sound recordings. Petitioners did not listen to any of the masters prior to leasing them nor did they seek independent appraisals of the masters. Further, there is no objective support for the valuation amounts which they claimed. Petitioners' actions did not remotely approach the actions which reasonable and ordinarily prudent persons would have taken under the circumstances. See Neely v. Commissioner, supra. Tax benefits motivated petitioners to participate and they failed to exercise due care to investigate the economic background of the children's recording industry or the Jarelco program. The deficiencies resulting from the master recordings are due to negligence and intentional disregard of the rules and regulations. Accordingly, petitioners are liable for the additions *393 to tax under section 6653(a)(1) and (2). [18]
D. SECTION 6659 ADDITION TO TAX A graduated addition to tax is imposed when an individual has an underpayment of tax which equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Section 6659. A valuation overstatement occurs "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Section 6659(c). If the claimed valuation exceeds 250 percent of the correct value, then the addition is equal to 30 percent of the underpayment, but only to the extent attributable to the valuation overstatement. [19] *394 Jarelco purchased each of the masters from OEP for a purchase price of $ 195,000 with a cash downpayment of $ 3,000 and a promissory note for $ 192,000. Petitioners claimed investment tax credits based on purported values of $ 220,000 in 1982 and $ 260,000 in 1983. It has already been determined that the fair market values of the Jarelco masters bear no relationship to the values which petitioners claimed for the investment tax credits and that the transactions lacked economic substance. Where a transaction lacks economic substance, the taxpayer takes a zero basis in the asset and a valuation overstatement automatically *395 follows. [20]Zirker v. Commissioner,87 T.C. 970, 977-979 (1986). Accordingly, petitioners are liable for the section 6659 addition to tax for valuation overstatement. E. Section 6661 ADDITION TO TAX Respondent, in Amendments to Answer, raised additions to tax under section 6661 for docket numbers 6850-86, 8688-86, 8689-86, and 8690-86. Respondent bears the burden of proof. Rule 142(a); Tauber v. Commissioner,24 T.C. 179, 185 (1955). Section 6661, as amended by section 8002 of the Omnibus Reconciliation Act of 1986, provides that taxpayers whose income tax returns contain substantial understatements of income tax may be liable for additions to the tax equal to 25 percent of the underpayments attributable to such understatements. See Pallottini v. Commissioner,90 T.C. 498 (1988). *396 For tax shelter items, the addition can be avoided only if (1) there is substantial authority for the position taken on the return and (2) the taxpayer reasonably believed that such treatment was more likely than not the proper tax treatment. The taxpayer is considered to believe that the treatment of an item is more likely than not the proper treatment if the taxpayer analyzes the pertinent facts and authorities and, in reliance upon that analysis, reasonably concludes that there is a greater than 50 percent likelihood that the tax treatment of the item will be upheld. Section 1.6661-5(d)(1), Income Tax Regs.
A substantial understatement is an understatement of tax on a return that exceeds the greater of ten percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(1). The term "understatement" means the excess of the amount of tax required to be shown on the return for the tax year over the amount of the tax shown on the return. Section 6661(b)(2)(A). Section 6661(b)(3) provides that for the purposes of determining the amount of the addition to tax assessed under section 6661(a), the portion of the substantial understatement on which an addition is imposed *397 under 6659 shall not be taken into account. It is clear that petitioners in these docket numbers had substantial understatements of tax as defined in section 6661(b)(1) which are attributable to tax shelter items. None of the petitioners made an effort to determine the facts relating to the Jarelco promotion. None of the petitioners consulted an independent appraiser to determine the true value of the masters leased. None of the petitioners contacted independent tax advisers to determine authority for the claimed credits and deductions. Accordingly, petitioners in these docket numbers are liable for additions to the tax under section 6661. They are liable to the extent that the understatement in tax exceeds the portion of the understatement on which an addition under section 6659 is imposed. This computation may be made under Rule 155.
F. SECTION 6621(c) ADDITIONAL INTEREST Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to one or more tax-motivated transactions." [21]Stanley Works v. Commissioner,87 T.C. 389 (1986). *398 The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax-motivated transactions include valuation overstatements and deductions disallowed from activities not entered into for profit. Section 6621(c)(3); section 301.6621-2T, *399 Q-4 and A-4, Proced. and Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 59394 (December 28, 1984). Congress specifically amended section 6621(c)(3)(A), adding to the list of tax-motivated transactions "(v) any sham or fraudulent transaction." [22] "Any sham or fraudulent transaction" includes transactions that lacked profit motive and which were without economic substance. Patin v. Commissioner, supra at 1128-1129. The Jarelco master recording venture is one lacking economic substance and is thus a tax motivated transaction under the provisions of section 6621(c)(3)(A)(v). See Cherin v. Commissioner,89 T.C. 986 (1987); Patin v. Commissioner, supra.
Accordingly, the sanction of section 6621(c) is appropriate in these cases. The amounts of the underpayments attributable to tax motivated transactions will be determined in the course of the Rule 155 determinations.
G. AWARD OF DAMAGES UNDER SECTION 6673
Section 6673 provides that the Tax Court may award damages *400 not in excess of $ 5,000 whenever it appears that the taxpayer instituted or maintained proceedings primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless. Petitioners exchanged a small cash amount for large tax deductions from a nonrecourse transaction that lacked underlying economic substance or entrepreneurial risk. See Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972 (1983). Damages, however, will not be awarded under section 6673 in these cases. Similarly situated taxpayers are warned that damages are likely to be awarded in the appropriate case. Decision will be entered under Rule 155.
Footnotes
1. The following cases are consolidated: Gordon Hall, docket No. 8688-86; George M. and Gloria E. Wolfe, docket No. 8689-86; Howard V. and Amy H. West, docket No. 8690-86; and John W. and Gina Y. Powers, docket No. 19873-86. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted. ↩
3. Counsel selected these petitioners with the approval of the Court to be a consolidated test case. This test case will serve to resolve numerous issues common to a much larger group of individuals who invested in the Jarelco master sound recording leasing program.↩
*. Amount to be determined (i.e., 50 percent of the interest due on the portion of the underpayment attributable to negligence) under section 6653(a)(2)↩. 4. Subsection (d) of section 6621↩ was redesignated subsection (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, section 1511(c)(1)(A)-(C), 100 Stat. 2744. The reference to the Internal Revenue Code as redesignated and amended will be used. 5. Petitioners argued for the first time at trial that respondent improperly failed to extend the same settlement offer to petitioners that was extended to other Jarelco investors. Petitioners did not address this issue in either their original briefs or their reply briefs. Since petitioners failed to properly plead this issue and subsequently abandoned it, it will not be considered. Rule 151(e); Camp Wolters Enterprises, Inc. v. Commissioner,22 T.C. 737 (1954), affd. 230 F.2d 555(5th Cir.), cert. denied 352 U.S. 826↩ (1956). 6. Masters are used to manufacture audio products such as records and cassette tapes. Only a master can exactly duplicate an audio program. ↩
7. OEP did not begin producing the Jarelco masters until September 1982. ↩
8. James A. Rumpf & Associates, Inc. was also used to locate investors. ↩
9. MAS was incorporated in 1983, and operated under the name of Protech Accounting Corporation after mid-1984. References to this organization will be to MAS. 10. BFM also retained Maria Mutschler to prepare Federal income tax returns and amended returns for some of its clients who invested in Jarelco. ↩
11. Petitioner Wolfe did not testify at trial. ↩
12. The 1982 Jarelco promotion promised the right to distribute products derived from the masters throughout the United States and Canada only, while the 1983 Jarelco promotion promised worldwide distribution rights. ↩
13. Some accounts originally offering Jarelco cassette tapes at $ 4.98 later lowered the price to 99". ↩
14. The record does not show whether petitioner Wolfe also signed a distribution agreement with SCS. ↩
15. Section 183(a) provides the general rule that, in the case of an activity not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(b)(1) provides that there shall be allowed those deductions that would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit shall be allowed only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). Section 183(c) defines the term "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩." 16. Section 1.183-2(b), Income Tax Regs., lists the following factors to be considered, in addition to all of the facts and circumstances surrounding the activity, in this determination: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity. 17. Generic tax shelters may involve a variety of assets such as books, master recordings, lithographic materials, innovations/inventions, mining ventures, and films. Rose v. Commissioner,88 T.C. 386↩ (1987). 18. Section 6653(a)(2)↩ is to be computed with reference to the total underpayment.
19. Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See Todd v. Commissioner,89 T.C. 912 (1987), on appeal (5th Cir., Jan. 16, 1988). On brief, petitioners invite this Court to find that the Jarelco master recordings were not placed in service during the years that they claimed the investment tax credit, amortization, and other related deductions. If accepted, this concession would result in the disallowance of the claimed investment tax credit, not because it was overvalued, but because it was not placed in service in the year claimed. Todd v. Commissioner, supra.
We decline to accept this concession. Petitioners had ample opportunity to concede this issue at trial and failed to do so. In addition, the record is inconclusive with respect to the placing in service of the master recordings. Their invitation to concede on brief is an attempt to avoid the obvious overvaluation. ↩
20. This is in contrast to a fraudulent transaction where the assets are not placed in service during the years before the Court because the assets do not exist and the valuation question is not reached. Chellappan v. Commissioner,T.C. Memo. 1988-208. A taxpayer cannot acquire basis in nonexistent property and there is no way to compute the difference between actual value and basis. Chellappan v. Commissioner, supra.↩
21. Section 6621 provides:
(c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. --
* * *
(3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting period specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩
22. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective for interest accruing after December 31, 1984, the original effective date of section 6621(d), now section 6621(c)↩.