JOE H. AND LESSIE M. WEST, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 20549-84, 20550-84.    Filed January 15, 1987.

*Dwight J.L. Epperson*, for the petitioners.
*R. Alan Lockyear* and *Richard W. Kennedy*, for the respondent.

SWIFT, *Judge*: In a statutory notice of deficiency dated April 5, 1984, respondent determined deficiencies in petitioners' Federal income tax liabilities and additions to tax as follows:

| Years | Deficiencies | Additions to tax sec. 6659 |
|-------|--------------|-----------------------------|
| 1977 | $3,591 | - - - |
| 1978 | 1,822 | - - - |
| 1979 | 5,823 | - - - |
| 1981 | 9,642 | $2,893 |
| 1982 | 4,798 | 1,439 |

After concessions, the issues for decision are: (1) Whether petitioners are entitled to deduct depreciation and to claim an investment tax credit with respect to the purchase of a single print of a motion picture; (2) whether, in the alternative, petitioners are entitled to deduct the out-of-pocket costs of the investment as a theft loss; and (3) whether petitioners are liable for the additions to tax under section 6659[1] set forth above. By way of written motion filed during trial of these consolidated cases, respondent also seeks the Court's determination as to whether petitioners are liable for the increased rate of interest for underpayments of tax attributable to tax-motivated transactions under section 6621(d).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in West Valley, Utah, at the time they filed their petitions in these consolidated cases. The deficiencies and additions to tax at issue relate to an investment made by petitioner Joe H. West in a motion picture entitled "Bottom." The motion picture was produced by Commedia Pictures, Inc. (Commedia), a Utah corporation. During the years in issue, Commedia was engaged in the production, distribution, and sale of motion pictures. Commedia had its principal place of business in Salt Lake City, Utah.

In 1981, Commedia offered investments in a feature-length motion picture entitled "Bottom." According to the prospectus associated with the investments, "Bottom" was to be a musical comedy about a Shakespearian actor named "Nick Bottom" who dies in a theater fire in 1605 and

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

reappears as a ghost in Salt Lake City, Utah, some 375 years later.

The prospectus sets forth purported gross revenues received by various distributors from major motion pictures such as "Grease," "Star Wars," and "Jaws 2." It provides some general information about the demand for the distribution of motion pictures, and briefly and generally describes the experience of the individuals acting in "Bottom." The prospectus also briefly describes other motion pictures Commedia intended to produce, sets forth a sample of a projection of the profits that might be made from a motion picture (not specifically "Bottom"), and a description of the different ways investments could be made in "Bottom." The prospectus also provides a specific and detailed schedule of the tax benefits purportedly flowing from an investment in "Bottom," and a legal opinion which specifically states that the opinion is not based on the attorney's independent verification of the facts with respect to which the opinion is rendered.

Conspicuously absent from the prospectus are any specific projections of the profit that might realistically be expected from the motion picture "Bottom." Also absent from the prospectus is any helpful information about the actual success and experience of Commedia in producing and distributing motion pictures. All that is said about Commedia is the following:

Commedia Pictures Inc. is a Utah corporation engauged [sic] in the business of producing quality motion pictures, for both domestic and foreign television and theatrical release. Commedia maintains its home office at 1879 South Main Suite 104 Salt Lake City, Utah 84115 at 801-486-3453. Commedia is insuring the integrity and excellence of its product by a staff of outstandingly compentent [sic] craftsmen. The organization is based on absolute integrity and efficiency principles.

According to the prospectus, the projected cost of producing "Bottom" was "close to $1,000,000." Also according to the prospectus, investments in the motion picture could be structured in two different ways. Under the first structure, ownership of "Bottom" was divided into 100 units, each of which was to be sold to investors for $10,000 in cash. No debt or leverage was to be associated with such an investment. Commedia would have the right to and respon-

sibility for distributing and marketing the movie and would be paid a distributor's fee for those services, which fee would be paid out of sales proceeds from the motion picture.

Under the second structure described in the prospectus for investing in "Bottom," investors could purchase individual prints of "Bottom." After acquiring ownership of a print, an investor would have the complete rights to and responsibility for marketing and distributing his individual print of "Bottom." Commedia was not to be involved in the marketing and distribution of prints of "Bottom" owned by individual investors. Each investor who owned a print would be required to negotiate for the viewing of his particular print anywhere in the world.

Under this second method of investing in "Bottom," the purchase price for an individual print of "Bottom" was stated in the prospectus to be "$18,000 with a 10 percent down payment and the balance due over a 10 year period." Documents attached to the prospectus clarified that the purchase price for individual prints of "Bottom" actually was to be $180,000, to be paid by an $18,000 cash downpayment and a $162,000 recourse promissory note due in installments over 10 years. The prospectus also indicated, however, that during the last 5 years of the note, the investor's obligation thereunder could be converted by the investor to a nonrecourse obligation merely upon the payment of $1,000. The prospectus represented that a maximum of 30 prints of "Bottom" would be sold to individual investors and that the reason individual prints were being sold to individual investors was to raise funds "to meet production costs."

The record does not indicate that any investors purchased undivided interests in "Bottom" under the first investment alternative described in the prospectus. Instead, apparently all 100 investors who purchased an interest in "Bottom" purchased individual prints thereof under the terms of the second investment alternative described in the prospectus.

Sometime in the early fall of 1981, petitioner Joe H. West[2] obtained a copy of the prospectus describing the investment opportunity in "Bottom." On October 23, 1981,

[2]Hereinafter, all references to petitioner are to Joe H. West.

petitioner signed a Production Service Agreement in which he agreed to purchase a single print of "Bottom" for $180,000. The representative of Commedia, Frank Evans, and petitioner backdated the agreement to June 30, 1980. The agreement stated that the producer (Commedia) "shall deliver the print(s) to owner on or before December 10, 1980."

At the same time petitioner signed the Production Service Agreement, he also signed a promissory note to Commedia for $162,000. The note also was backdated to June 10, 1980, and expressly stated that it was a recourse liability. No payments of principal were due on the note during the initial 5 year term thereof except out of proceeds from the distribution of the individual print. Minimum payments of $5,000 were due each January 10 of the initial 5 years of the note with the first payment due on January 10, 1983. This annual $5,000 payment was due regardless of the availability of proceeds from distribution of the film and was to be applied only to interest which accrued at approximately 10 percent per annum.

At the end of the initial 5-year term of the promissory note, the entire principal and accrued interest became due and payable. Petitioner, however, had the option to extend the note for another 5 years during which, according to the prospectus, the note could be converted to a nonrecourse obligation of petitioner by the payment of $1,000.

On or about October 19, 1981, petitioner received an undated form letter from Commedia Pictures containing the following statement concerning the "recourse" nature of the promissory note petitioner had signed:

THIS letter is to inform you and to carify [sic] our position on the following points; To the maker of a certain note conserning [sic] the financing of the said prints or print numbered herein above, and executed by the print holder or owner above, we hereby make the following representations that may be relied upon. *1. that the maker of the said note shall not be responsible for any payments whatsoever as to the principal or interest arising out of the said note excepting therefrom the amounts that become due and owing out of the proceeds of the income from the motion picture "BOTTOM" HEREIN.* 2. It is also mutually understood and agreed, that in no case shall this note be sold or assigned or hypothecated in any way whatsoever, and 3. in no case shall the said note be declared "DUE AND PAYABLE" due to nonpayment of the

said note, other than the sums that become due and payable from the proceeds from the said motion picture "BOTTOM". [Emphasis added.]

Although the promissory note required him to make a downpayment of $18,000 to Commedia, on October 23, 1981, petitioner paid Commedia only $400. In order to pay the additional amount due on the downpayment, petitioner needed only the creative assistance of Commedia. Prior to the end of 1981, petitioner met with Pat Rundel, a tax return preparer who worked for Commedia. She prepared on behalf of petitioners an amended Federal income tax return for 1980, reflecting thereon petitioner's purported 1980 investment in "Bottom." Petitioner's basis in the movie was reported on the amended return to be $180,000, and $200 in income from the movie was reported on the amended return.

Additionally, a net operating loss of $29,714 and an investment tax credit of $18,000 was claimed on petitioners' amended 1980 return with respect to petitioner's alleged investment in "Bottom." Petitioners filed with the Internal Revenue Service the amended 1980 return and claims for refund based on the carryback to 1977, 1978, and 1979 of the portion of the 1980 claimed net operating loss and investment tax credit not used on the 1980 amended return.

On February 2, 1982, petitioners received a refund from the Internal Revenue Service in the amount of $11,236, plus interest of $1,400 (totaling $12,636), with respect to the claims for refund for 1977, 1978, and 1979 petitioners had filed with the Internal Revenue Service. From the $12,636 received from the Internal Revenue Service as a result of the refund claims, in February of 1982 petitioner paid Commedia $10,000 as part of the balance due on the downpayment he owed with respect to his investment in "Bottom." The claim for refund reflected on the 1980 amended return was not acted upon, and petitioners received no refund with respect to 1980.

During 1981 and 1982, petitioner assisted on a part-time basis in the movie production activities of Commedia by performing a variety of odd jobs. Petitioner was not compensated by Commedia for his services.

In September or October of 1982, production of "Bottom" was completed. On November 8, 1982, "Bottom" was given

a "PG" rating by the Motion Picture Association of America. Petitioner never received possession of his print of the movie. In December of 1982, he apparently agreed to a distribution agreement with respect to "Bottom" under which Wide World of Entertainment (Entertainment), the parent organization of Commedia, was to market and distribute "Bottom" throughout the world, including petitioner's print thereof.

On March 4, 1983, Entertainment rented a theater in Salt Lake City, Utah, and held a private showing of "Bottom" and three other films produced by Commedia. The record does not disclose whether "Bottom" was ever shown to a paying audience, but it is established that petitioner received no income from the film during the years in issue. Petitioner, himself, made no attempt to market or distribute the film.

Petitioners' Federal income tax returns for 1981 and 1982 also were prepared with the assistance of Ms. Rundel, representing Commedia. Petitioners did not claim on those returns an investment tax credit with respect to "Bottom." Petitioners did report gross income from and deductions for depreciation with respect to their print of "Bottom" on their 1981 and 1982 returns, as follows:

| Year | Gross income | Depreciation |
|------|------|------|
| 1981 | $200 | $41,750 |
| 1982 | 0 | 31,237 |
| Totals | 200 | 72,987 |

Upon audit, respondent determined that petitioner did not invest in "Bottom" with an actual and honest objective of making a profit, and respondent disallowed the net operating losses, depreciation deductions, and investment tax credit relating to the film claimed on the returns for the years at issue herein. Respondent determined deficiencies for 1977, 1978, 1979, 1981, and 1982. No deficiency for 1980 was determined because, as explained, petitioners' claim for refund on their 1980 amended return was not allowed. Petitioners now concede that respondent's determinations with respect to the deficiencies in their Federal income tax liabilities for 1977, 1978, and 1979 are correct. That concession is based on the nonexistence of the movie in 1980, the loss carryback year. Petitioners did not claim on

their 1981 or 1982 returns an investment tax credit with respect to the film "Bottom," nor did they do so in their petition herein. Petitioners apparently have abandoned any claim to an investment tax credit with respect to their investment in "Bottom."

## OPINION

### *Depreciation Deductions*

The first issue for decision is whether petitioners are entitled to depreciation deductions in 1981 or 1982 with respect to the investment petitioner made in a print of "Bottom." Petitioners contend they are entitled to depreciation with respect thereto based on a cost of $180,000.

Section 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear* and tear * * * of property used in a trade or business" or "property held for the production of income." The period for depreciation of an asset begins when the asset is placed in service. Sec. 1.167(a)-10(b), Income Tax Regs.

An investment constitutes a trade or business or an investment made for the production of income if the taxpayer entered into the investment with the actual and honest objective of making a profit. *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Hager v. Commissioner*, 76 T.C. 759, 784 (1981), and cases cited therein; *Jasionowski v. Commissioner*, 66 T.C. 312, 318-319 (1976). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all the surrounding facts and circumstances. *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981).

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors that are relevant to the factual determination of whether an investment was entered into with an actual and honest objective of earning a profit. Those factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the

activity may appreciate in value; (5) the taxpayer's history of income or losses with respect to the activity; and (6) the amount of occasional profits, if any, that are earned.

Initially we note petitioners' concession that "Bottom" was not completed nor placed in service until late 1982. Petitioners, therefore, are not entitled to deduct depreciation with respect to the film on their 1981 Federal income tax return. Petitioners do not seriously contend otherwise.

With respect to depreciation deducted in 1982, petitioners make vague and general arguments that the investment was entered into with an actual and honest objective of making a profit. Respondent obviously contends otherwise. We have examined the record as a whole and are satisfied that petitioner did not invest in "Bottom" with an actual and honest profit objective. Indeed, it is overwhelmingly apparent that petitioner invested in the movie primarily, if not exclusively, in order to obtain tax deductions and credits to offset Federal income taxes owed by petitioners during the years at issue.

The prospectus petitioner received in connection with his investment in "Bottom" described detailed tax benefits, but gave investors no specific or even general profit projections with respect to "Bottom." The downpayment to be made by investors in "Bottom" was to be funded not by the investors, but by tax refunds obtained from the Internal Revenue Service as a result of filing an improper and perhaps fraudulent amended return for 1980 and by the carryback of the loss reported thereon to generate improper tax refunds for the years 1977 through 1979. The activity before us simply cannot be regarded as a legitimate investment of any kind.

If it is necessary to consider petitioner's investment in "Bottom" further, we note the testimony of respondent's experts to the effect that petitioner's print of the movie had a value of not more than $150. The concept of selling to investors a single print of the movie was inherently flawed. Any chance that such an investor would be able to market his print successfully was doomed from the beginning.

It is beyond question that the $180,000 purchase price for the movie was grossly inflated and that the $162,000 promissory note executed by petitioner does not constitute

genuine debt for Federal income tax purposes. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). In buying one print at an inflated price, petitioner immediately was placed at a tremendous disadvantage in that to make a profit, the movie had to generate revenues far in excess of what it feasibly could produce. See *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The quality of the movie was substandard, and the movie had essentially no prospect of generating revenue. The use by petitioner of inflated nonrecourse debt to acquire the print of the movie, as well as the overall lack of quality in the production of the movie, provides strong evidence that petitioner's investment in "Bottom" was not entered into with an actual and honest objective of making a profit. *Seaman v. Commissioner*, 84 T.C. 564, 595-596 (1985); *Estate of Thomas v. Commissioner*, 84 T.C. 412, 439 (1985).

We can in no way excuse or overlook the perhaps criminal conduct of Commedia in backdating documents associated with petitioner's investment and in assisting in the preparation of false Federal income tax returns. Furthermore, we do not accept petitioner's story that he was innocently beguiled by representatives of Commedia.

Upon consideration of all the facts and circumstances in this case, it is clear that petitioner invested in Commedia solely for the purpose of buying tax benefits. He did not invest with an actual and honest objective of making a profit from the sale and distribution of the film "Bottom." Depreciation claimed by petitioners with respect to "Bottom" is not allowable.[3]

*Theft Loss*

In an alternative argument, petitioners contend that they are entitled to a deduction for a theft loss in the amount of $11,400 for the cash petitioner paid to Commedia. Petitioners apparently argue that petitioner was fraudulently induced to pay Commedia $11,400, and that petitioners

---

[3]For a discussion of the at-risk limitation of sec. 465 on deductions and credits claimed with respect to allegedly recourse obligations that are convertible to nonrecourse obligations by the payment of a nominal conversion fee, see *Porreca v. Commissioner*, 86 T.C. 821, 839-843 (1986). In light of our disallowance of the depreciation deductions claimed herein under sec. 167, it is not necessary to address the limitations of sec. 465.

discovered the fraud during 1982. Respondent argues that petitioners have failed to prove that any loss due to fraud upon petitioners occurred and that even if such a loss did occur, it was not discovered by petitioners during the years in issue.

Section 165[4] allows as a deduction any theft loss sustained during the taxable year and not otherwise compensated for by insurance or otherwise. Under section 165(e), a theft loss is "sustained during the taxable year in which the taxpayer discovers such loss." If in the year of discovery, however, there exists a claim for reimbursement, no loss shall be considered sustained until the taxable year in which it can be ascertained with reasonable certainty that no reimbursement will be received. Sec. 1.165-1(d)(3), Income Tax Regs.[5]

For Federal income tax purposes, the issue of whether a theft loss occurred must be determined under the laws of the State or other jurisdiction wherein the loss allegedly was sustained. *Paine v. Commissioner*, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); *Monteleone v. Commissioner*, 34 T.C. 688, 692 (1960). The exact nature of a theft, whether it be larceny, embezzlement, obtaining money by false pretenses, or other wrongful deprivation of property of another, is of little

---

[4]Sec. 165 provides in relevant part:

SEC. 165(a). GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

\* \* \* \* \* \* \*

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

[5]Sec. 1.165-1(d)(3), Income Tax Regs., provides, in relevant part:

(d) *Year of deduction.* \* \* \*

(3) Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see sec. 1.165-8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of sec. 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

importance provided it constitutes a theft. *Edwards v. Bromberg*, 232 F.2d 107, 111 (5th Cir. 1956); *Norton v. Commissioner*, 40 T.C. 500, 506 (1963), affd. 333 F.2d 1005 (9th Cir. 1964).

Utah Code Ann. sec. 76-6-404 (1978), defines "theft" as follows:

Theft—Elements.—A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof.

Utah Code Ann. sec. 76-6-405 (1978), defines "theft by deception" as follows:

Theft by deception.—(1) A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof.

(2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed. "Puffing" means an exaggerated commendation of wares or worth in communications addressed to the public or to a class or group.

Petitioner must establish that he "parted with money on the strength of * * * false representations * * * within the meaning of the criminal law." *Estate of Melcher v. Commissioner*, 476 F.2d 398 (9th Cir. 1973), affg. a Memorandum Opinion of this Court. We previously have held that to sustain a theft loss deduction with respect to amounts paid in connection with a scheme to avoid taxation, the taxpayer must demonstrate that he entered into the transaction only after having been deceived as to its nature. *Nichols v. Commissioner*, 43 T.C. 842, 887 (1965); see also *Estate of Melcher v. Commissioner, supra.*

On the record before us, there is no evidence to support petitioners' contention that a theft loss occurred in connection with cash amounts petitioner paid to Commedia, or that any such theft was discovered prior to or during 1982, the latest of the taxable years in issue. Certainly Commedia did not exercise unauthorized control over petitioners' funds within the meaning of Utah law because the evidence clearly shows that petitioner was a willing investor in "Bottom." Petitioners are now dissatisfied with Commedia primarily because they will not realize the significant tax benefits they anticipated when petitioner invested in "Bot-

tom." On this record, we cannot conclude that petitioners sustained a theft loss within the meaning of section 165(c).

Even if petitioners sustained a theft loss with respect to the cash invested in Commedia, the evidence clearly establishes that any such loss was not discovered until after the years in issue. Throughout 1982, production of "Bottom" was still under way and petitioner performed some work on the production of the movie. It was not until petitioner actually viewed "Bottom" and the other films produced by Commedia in March of 1983, that he began to be concerned that his investment in "Bottom" had been unwise. As of the time of trial, petitioners had not contacted law enforcement authorities with respect to petitioner's suspicions of bad-faith dealing by Commedia, and petitioners did not report a theft loss deduction with respect to "Bottom" during any of the taxable years at issue herein. The record contains no evidence that supports petitioners' contention that they discovered the alleged theft loss prior to 1983. We sustain respondent on this issue.

Petitioners also make a general argument that on equitable grounds they should be entitled to deduct in 1981 or 1982 the cash out-of-pocket petitioner invested in "Bottom." We find no basis for such a deduction. We look in vain for any equities in this case that run in favor of petitioners.

*Sections 6659 and 6621(d)*

For taxable years 1981 and 1982, respondent determined an addition to tax for 1981 and 1982 under section 6659. Section 6659[6] provides an addition to tax of up to 30

---

[6]Sec. 6659 provides, in relevant part:

SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX.

(a) ADDITION TO THE TAX.—If—

(1) an individual, or

(2) a closely held corporation or a personal service corporation,

has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable.

(b) APPLICABLE PERCENTAGE DEFINED.—For purposes of subsection (a), the applicable percentage shall be determined under the following table:

percent of the portion of the underpayment of tax that is attributable to an overstatement on the tax returns of the value of property or of its adjusted basis, by an amount that equals 150 percent or more of its true value or true adjusted basis. Petitioners reported on their amended Federal income tax return for 1980 and on their 1981 and 1982 Federal income tax returns that their adjusted basis in one print of the movie "Bottom" was $180,000. We previously have determined, however, that the $162,000 nonrecourse promissory note executed in connection with the purchase of "Bottom" was grossly inflated, contingent on future profits from the film, and did not represent genuine indebtedness for Federal tax purposes. Accordingly, petitioner's basis in the film is not increased by the amount of the $162,000 nonrecourse note, and petitioner's basis in the movie did not exceed $11,400, the cash amount paid by petitioner therefor. Therefore, petitioners made an overvaluation of the adjusted basis of the film print within the meaning of section 6659(c) in excess of 1,500 percent. Because all of the underpayment of tax at issue in 1981 and 1982 (after concessions by the parties) is attributable to depreciation deductions taken with respect to petitioner's investment in "Bottom," the section 6659 addition to tax applies to the entire deficiency that remains at issue for those years. We so hold.

Finally, respondent moves the Court to determine whether petitioners are liable under section 6621(d)[7] for the

---

| If the valuation claimed is the following percent of the correct valuation— | The applicable percentage is: |
|---|---|
| 150 percent or more but not more than 200 percent | 10 |
| More than 200 percent but not more than 250 percent | 20 |
| More than 250 percent | 30 |

(c) VALUATION OVERSTATEMENT DEFINED.—

(1) IN GENERAL.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

(2) PROPERTY MUST HAVE BEEN ACQUIRED WITHIN LAST 5 YEARS.—This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.

[7]Sec. 6621(d) provides, in relevant part:

(d) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

increased rate of interest on substantial underpayments of tax attributable to tax-motivated transactions. Section 6621(d) was enacted, among other reasons, "to put more teeth into section 6659." *Neely v. Commissioner*, 85 T.C. 934, 957 (1985). The amount of interest payable under section 6621(d) is 120 percent of the amount established under section 6621(b), and is applicable with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of the enactment of section 6621(d). *Stanley Works and Subsidiaries v. Commissioner*, 87 T.C. 389 (1986); *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985).

For purposes of section 6621(d), a substantial underpayment is defined as "any underpayment of taxes * * * which is attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000." A tax-motivated transaction includes any valuation overstatement under section 6659(c). Sec. 6621(d)(3)(A)(i); see, e.g., *Snyder v. Commissioner*, 86 T.C. 567 (1986); *Parker v. Commissioner*, 86 T.C. 547 (1986). We have held that a valuation overstatement under section 6659(c) was made, and we therefore find that petitioners' substantial underpayments of tax were due to a tax-motivated transaction within the meaning of section 6621(d). Because all of the underpayment of tax at issue herein (after concessions by the parties) is attributable to the valuation overstatement, we find that the section 6621(d) addition to interest applies to the entire portion of

---

(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).

(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX-MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term "substantial underpayment attributable to tax-motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) TAX MOTIVATED TRANSACTIONS.—

   (A) IN GENERAL.—For purposes of this subsection, the term "tax-motivated transaction" means—

   (i) any valuation overstatement (within the meaning of section 6659(c)),

the deficiency determined by respondent that remains at issue herein. Respondent's motion will be granted.

*Decisions will be entered under Rule 155.*