BEVERLY E. DOYLE AND SAVILLA J. DOYLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doyle v. Commissioner
Docket Nos. 37124-86; 27369-87
United States Tax Court
T.C. Memo 1989-465; 1989 Tax Ct. Memo LEXIS 465; 57 T.C.M. (CCH) 1441; T.C.M. (RIA) 89465; August 29, 1989; As corrected September 6, 1989 Steven M. Cyr, Leanne M. Bowker, and Thomas O. Moe, for the petitioners. Henry Thomas Schafer, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax for 1978 through 1983: Additions to Tax
Year
Deficiency
§ 6653(a) [1]
§ 6653(a)(1)
§ 6653(a)(2)
§ 6659
1978
$ 5,376
$ 268.80
--
--
$ 1,612.80
1979
5,293
264.65
--
--
1,587.90
1980
1,493
75.65
--
--
447.90
1981
8,309
--
$ 415.45
50% of interest
2,492.70
due on $ 8,309
1982
4,922
--
246.10
50% of interest
1,476.69
due on $ 4,922
1983
3,656
--
182.80
50% of interest
1,096.80
due on $ 3,656
*468 In addition, respondent has determined that petitioners are liable for additional interest under section 6621(c) (formerly section 6621(d)) for all years in question. The parties agreed that the disposition of the substantive issues in these consolidated cases will be controlled by the formula adopted in the final decision in Weldon v. Commissioner, docket No. 13512-85 (reported as Secoy v. Commissioner, T.C. Memo. 1987-286); and, to the extent relevant and material, the findings of fact and conclusions of law in McCain v. Commissioner, T.C. Memo. 1987-285, and Secoy v. Commissioner, T.C. Memo. 1987-286 (on issues other than the claimed theft loss, additions to tax and additional interest), are incorporated in the stipulation. In these cases, the Court held that claimed investment tax credits and depreciation deductions with respect to master recordings marketed by Jerden Industries, Inc., were not allowable. The decisions of this Court in Weldon, McCain and Secoy have *469 now been affirmed (without opinion) by the Court of Appeals for the Ninth Circuit. Estate of Secoy v. Commissioner, 869 F.2d 1498 (9th Cir. 1989). The Court of Appeals made no changes in the findings of fact or conclusions of law stated in this Court's opinions in those cases. Petitioners have stipulated that Sunshine I, Ltd. (sometimes hereinafter Sunshine I or the partnership), a limited partnership which purportedly acquired two master recordings from Jerden Industries, Inc., in fact never acquired the "master recordings" and that the "long-term recourse promissory note" given purportedly as consideration for the recordings, and a related LaSalle Overseas Bank, Ltd. "loan commitment" were shams, without economic substance. The issues remaining for decision are as follows: (1) Whether petitioners, for 1983, are entitled to a "theft loss" deduction under section 165 for the amounts they actually paid with respect to their investment in Sunshine I; (2) Whether petitioners are liable under section 6653(a) and section 6653(a)(1) and (a)(2) for additions to tax for negligence or intentional disregard of the rules; (3) Whether petitioners had an underpayment *470 of tax which is attributable to a valuation overstatement and are thus liable for additions to tax under section 6659; and (4) Whether petitioners are liable for additional interest under section 6621(c) for any substantial underpayment attributable to tax-motivated transactions. FINDINGS OF FACT During the tax years in issue, and at the time of filing of the petition, petitioners Beverly E. Doyle and Savilla J. Doyle, husband and wife, resided in Corvallis, Oregon. Throughout the years in question, petitioner Beverly E. Doyle (Mr. Doyle) was a journeyman lineman for Consumers Power, Inc., and petitioner Savilla J. Doyle (Mrs. Doyle) was head secretary at the Corvallis Elementary School. Mrs. Doyle became acquainted with Christopher P. Murphy (Murphy) in 1974, when he sold her an annuity policy which was made available to employees of local school districts. Mrs. Doyle later cashed in her annuity upon Murphy's advice and invested the proceeds in ventures he recommended. Mr. Doyle became acquainted with Murphy in 1978 during one of Murphy's visits to petitioners' home. Based on Murphy's advice, Mr. Doyle had his interests in certain T. Price Rowe mutual funds redeemed and *471 he invested the cash proceeds with Murphy. During 1980, 1981, and 1982, petitioners invested $ 73,570 of their savings in nine limited partnership investments recommended by Murphy. The majority of these partnerships involved apartment housing. Beginning with petitioners' income tax returns for 1980 and continuing through at least 1983, petitioners claimed loss deductions with respect to these investments. The following table shows the investments that Murphy sold to petitioners before and after Sunshine I, petitioners' receipts and the loss deductions claimed on their income tax returns for 1980 through 1983 with respect to those investments: Amount
Cash
Loss Deductions
Partnership
Invested
Received
1980-1983
LaTourelle Apartments
$  5,000.00
$ 1,350.00
$  2,692.00
Colony Park Apartments
5,000.00
250.00
3,369.00
Brooktree Apartments
5,000.00
300.00
2,540.00
Kane Manor Apartments
5,000.00
-0-   3,916.00
Sunshine I, Ltd.
1,500.00
-0-   43,032.00
Hydrocarbons Oil & Gas
9,750.00
414.83
7,030.00
Suburban Estates
5,000.00 [2]
372.75
487.00
Food Source Containers
13,000.00 [3]
-0-   Terrax Oil & Gas
10,000.00 300.00
5,601.00
$ 59,250.00
$ 2,987.58
$ 68,667.00
*472 Petitioners purchased a 3/16 limited partnership interest in Sunshine I from Murphy in 1981. Sunshine I was the fifth of the nine investments acquired through Murphy but was the first and only master recording investment made by petitioners. Petitioners had no experience or expertise in the record or music business, and they knew that Murphy had no such expertise. Murphy represented that Frederick Johnston, the general partner for Sunshine I, had purportedly purchased for the partnership from Jerden Industries, Inc., two master recordings, numbers 8520 and 6001. Master recording number 8520 featured Mickey Gilley, a well-known country music artist; master recording number 6001 featured The Small Faces, an English rock group. The purchase price purportedly paid by Sunshine I for each master recording was $ 452,000, with a cash down payment of $ 21,000 and a long-term purportedly recourse note of $ 431,000. Neither Sunshine I nor petitioners obtained any right, title or interest in any recordings *473 by Mickey Gilley or The Small Faces from Jerden Industries, Inc., or anyone else in 1981, 1982, or 1983. During the taxable years in question, petitioners had no knowledge that Sunshine I had not acquired the two master recordings. The parties have stipulated that in 1981 a nonexclusive license interest in each of the subject recordings would have had a maximum fair market value of $ 5,000 per album. An exclusive interest (assuming one to be available) in the Mickey Gilley master recording would have had a maximum fair market value of $ 10,000 for the album, and an exclusive interest (assuming one to be available) in The Small Faces master recording would have a maximum fair market value of $ 30,000 for the album. In May 1981, prior to the purchase of their Sunshine I partnership interest, petitioners received and reviewed a document entitled "Synopsis of Purchase of Master Sound Recordings -- Jerden Industries, Inc. (Seller)" (hereinafter synopsis). Petitioners referred to this synopsis as the "tax opinion." Discussing the purchase price of the master recordings and the terms of payment, the synopsis stated that the purchase price shall be paid by cash and recourse note; the *474 purchaser shall have the option of paying the entire down payment in cash at closing or paying one-half in cash in 1981 and executing a recourse note for the payment of the remaining amount of the down payment due one year from date of closing or June 30, 1982, whichever is first; the balance shall be paid by the purchaser executing a recourse promissory note due in ten years to Jerden Industries, the note requiring annual payments varying from $ 800 to $ 4,000 per year, beginning in the third year and ending in the tenth year. The synopsis projected the tax consequences from the purchase of two $ 452,000 master recordings where the cost of each investment unit is $ 5,000 (6.25-percent partnership interest) and the minimum annual payment on the long-term recourse note for the third through tenth year is $ 465 each year. Assuming the "worst instance of zero income" for the partnership, Jerden projected $ 4.20 of tax savings for every $ 1 invested over ten years. On or before May 18, 1981, when petitioners subscribed to three partnership units in Sunshine I, petitioners received a prospectus for Sunshine I, Ltd. -- "A Proposed Washington Limited Partnership." The prospectus stated *475 that the partnership would not be formed until eight partnership units had been sold at $ 5,000 per unit and that the objective of the partnership was "to derive income by investing in the purchase of Master Sound Recordings, and obtaining income through the distribution and sale of record albums." The prospectus contained a standard risk disclosure statement, and various warnings of the inherent risks associated with investing in a limited partnership. The prospectus warned that investors should not rely on economic projections made on behalf of Sunshine I, that the general partner had no prior history in managing a partnership of this nature, that each investor should contact his or her own counsel, accountant, or business advisor as to legal, tax, and related matters concerning his or her investment. Attached to the prospectus was a Certificate of Limited Partnership of Sunshine I, Ltd., and a pre-organization subscription agreement. On May 18, 1981, petitioners signed a pre-organization subscription agreement to Sunshine I which was yet to be formed. The agreement prescribed the terms of the subscription and described the warranties and representations being made. Petitioners *476 agreed to purchase three partnership units at $ 5,000 per unit and paid $ 7,500 in cash at the time of signing. They also purportedly agreed to be personally liable for their share of the recourse note used for the purchase of the master sound recordings to be acquired by Sunshine I as well as the refinancing of such recourse note by any subsequent borrowings, extensions, etc., including additional fees to be paid in the third to the tenth year for loan commitments and letters of credit, etc. Petitioners' share of the partnership long-term purportedly recourse note was $ 169,500. Petitioners had no idea how many recording sales would be needed to pay off their share of the proposed liability on the notes before they would realize a net profit (other than the tax refunds) on their investment. With regard to the purchase of their Sunshine I, Ltd., partnership interest, petitioners expended the following sums of money: Check No.
Amount
Date
Payee
101
$ 5,000.00
04/02/81
Jerden Industries, Inc. 102
2,500.00
06/01/81
Jerden Industries, Inc. 109
8,377.80
05/28/82
Sunshine I
2200
1,395.00
07/25/83
Sunshine I
Petitioners were aware of *477 the tax benefits that the Sunshine I investment was supposed to provide. For years prior to 1981, Mrs. Doyle had always prepared petitioners' joint income tax returns. For 1981, 1982, 1983, and 1984, however, individuals recommended by Murphy prepared petitioners' returns. On their 1981 joint individual income tax return petitioners claimed investment tax credits totalling $ 16,950, using a basis of $ 169,500 for the two master recordings acquired by Sunshine I. They utilized $ 4,788 of such investment tax credits to claim a refund of taxes withheld for 1981 of $ 3,552. In April 1982, petitioners also filed a Form 1045 (Application for Tentative Refund) based on the carryback of unused portions of the 1981 investment tax credits to their 1978, 1979, and 1980 taxable years. Petitioners claimed and received refunds of income taxes for 1978, 1979, 1980, and 1981 in the following amounts, plus interest, from the utilization and carryback of the 1981 investment credit: Year
Amount of 1981 Credits Utilized
Refunds
1978
$ 5,376
$ 5,376
1979
5,293
5,293
1980
1,493
1,493
1981
4,788
3,552
In addition to the investment tax credit, *478 petitioners on their 1981, 1982, and 1983 returns claimed the following losses with respect to Sunshine I on Schedule E under the section entitled "Income or Losses from Partnerships, Estates or Trusts, or Small Business Corporations:" Year
Amount of Loss Claimed
1981
$ 10,629
1982
16,805
1983
15,598
On June 3, 1983, petitioners made inquiries to Sunshine I's general partner, Johnston, regarding the examinations of the partnership conducted by the Internal Revenue Service and the Oregon Department of Revenue. Upon receiving unsatisfactory responses from the general partner, petitioners became suspicious of how the partnership's business affairs were being conducted. During this time, petitioners also unsuccessfully inquired as to the status of the manufacture and distribution of the partnership's master recordings. Upon their failure to receive any adequate answers or explanations, petitioners made no further payments to Sunshine I after July of 1983. Around this time, petitioners had problems with the other investments they had made through Murphy. In April of 1983, they contacted an attorney, Mr. Cowgill, regarding misrepresentations by Murphy *479 in connection with petitioners' Food Source Containers investment. Mr. Cowgill facilitated the return of their $ 13,000 investment in Food Source. In late 1983 and early 1984, petitioners, following Mr. Cowgill's advice, filed suit against Brooktree Investors, Ltd. and LaTourelle Investors, Ltd., two of the apartment house limited partnerships petitioners became involved in through Murphy. Petitioners thought that these two partnerships, each of which was facing foreclosure on its apartment properties for unpaid taxes, were mismanaged and had not produced the promised cash flow. Petitioners did not name Murphy as a defendant in their lawsuits. As a result of their lawsuits against LaTourelle and Brooktree, petitioners eventually recovered their initial $ 5,000 investments in each of these partnerships, plus interest, and attorney's fees. On or about June 1984, the Corporation Commissioner of Oregon entered an order requiring Murphy to: (1) Relinquish his securities salesman license, broker-dealer license, and mortgage-broker license; (2) cease and desist from offering and selling securities within the state; and (3) cease and desist from making misrepresentations of material *480 facts or engaging in conduct constituting fraud and deceit in connection with the offer and sale of securities. The June 1984 order of the Corporation Commissioner was not based on any of petitioners' investments. As of the time of the trial of these cases, Murphy had been indicted by a grand jury in the Multnomah County Circuit Court of Oregon for the sale of securities by an unregistered person, for fraud and deceit with respect to the securities business, and for theft by deception. The indictment did not involve any transactions with petitioners. In determining the deficiencies set forth above, respondent disallowed the claimed investment tax credits and Sunshine I partnership losses. In addition, respondent determined that petitioners are liable for additions to tax under sections 6653(a), 6653(a)(1) and (2), and 6659 and for additional interest under section 6621(c). OPINION Theft Loss Deduction for 1983
Section 165(a)[4] allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. In the case of individuals, section *481 165(c) limits any such losses to, among other items, losses of property not connected with a trade or business if such losses arise from theft. Section 165(e) provides that any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss. Whether the taxpayer has sustained a theft loss is determined generally under the law of the jurisdiction where the loss was sustained. Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956); *482 Luman v. Commissioner, 79 T.C. 846, 860 (1982); West v. Commissioner, 88 T.C. 152, 162 (1987); sec. 1.165-8, Income Tax Regs. This rule includes losses attributable to a violation of Federal criminal statutes as well as state laws. E.g., Nichols v. Commissioner, 43 T.C. 842, 885 (1965). To support their claimed theft loss for 1983, petitioners rely upon an Oregon statute which, in general terms, makes it a crime, among other things, to make untrue statements of "material" facts or to employ any scheme or artifice to defraud a purchaser of securities if the purchaser relies on the misrepresentations of fact. Or. Rev. Stat. sec. 59.135, sec. 59.115(a) (1987). [5] In addition, petitioners assert that they were the victims of fraud in the sale of a security in violation of the basically similar Securities Act of 1933, 15 U.S.C. sec. 77(q)(a). *483 We agree with respondent that petitioners have not shown that they suffered a theft loss for 1983 within the meaning of section 165. Although Murphy may have made representations regarding the title and value of the purported master recordings which ultimately proved to be untrue, petitioners have not shown that the misrepresentations were material facts on which petitioners relied in parting with their cash outlays. Instead, we are convinced that petitioners, in the words of this Court in the related case of Secoy v. Commissioner, T.C. Memo. 1987-286, sought to purchase "a package of purported tax benefits with the attendant risks set forth in the materials [prospectus]. They took those risks voluntarily and must now bear the consequences." That petitioners' objective was to obtain a tax shelter is shown by their complete indifference to the economic realities of the Sunshine I partnership venture. They knew nothing about the music recording business. They were made aware that Johnston, the general partner in the partnership, had no prior experience in managing a music recording business. In deciding to enter the transaction they testified they relied *484 on Murphy but they knew that he, too, had no expertise in that business. Murphy told them that they should invest in the Sunshine I partnership because Jerden recordings, which had been previously recommended, had "title" and "tax" problems but the written materials available to petitioners show that Sunshine I acquired the recordings from Jerden. In fact, petitioners' first two checks in the amounts of $ 5,000 on April 2, 1981, and $ 2,500 on June 1, 1981, were payable to Jerden. Even after receiving this alert concerning tax and title problems petitioners proceeded with the deal without inquiry as to either the title, value, or possible tax problems that Sunshine I recordings might have. Petitioners testified that they knew that their share of the partnership debt would be $ 169,500 but they had no idea what amount, if any, of sales proceeds could be expected or would be required to enable them to pay off the liabilities they purportedly undertook or to recoup their out-of-pocket expenses. They have stipulated that the "long-term recourse promissory note" and related "loan commitment" are shams, without economic substance. All of these circumstances and others detailed in our *485 findings convince us that no representations by Murphy as to the title or value of the recordings were material, i.e., that petitioners were not induced to enter into this transaction by any of Murphy's representations as to the title or value of the alleged master recordings. In contrast, petitioners fully understood the tax benefits they sought to obtain. Mrs. Doyle had prepared petitioners' tax returns for years prior to 1981 and she knew the benefits provided by the investment tax credit and depreciation deductions. Petitioners had obtained tax benefits far in excess of any income received from other Murphy-recommended investments and expressed satisfaction as to their performance. Petitioners knew that they could expect refunds of their 1978 through 1981 taxes sufficient to fund the $ 15,000 down payment. The record shows that they received refunds of income taxes paid for 1978 through 1981 in a total amount of $ 15,714, plus interest thereon, a total sum approximating the out-of-pocket expenses they here claim as a deduction for a theft loss. The synopsis dated May 1, 1981, contained a table which showed that, for the first ten years, tax benefits of $ 4.20 would be obtained *486 for each $ 1 of cash invested based on "the worst instance of zero income for the partnership, other than guaranteed revenues from the seller sufficient to retire the partnership's installment debt under the recourse notes." As noted in our findings, however, the prospectus warned investors not to rely on any economic projections made on behalf of Sunshine I and that each investor should consult his own counsel on the legal, tax, and related matters concerning his investment. Had petitioners' tax returns escaped Internal Revenue Service audit, petitioners would have suffered no loss regardless of the title or value of the master recordings because they would have reaped at least $ 4.20 in refunded or reduced taxes for each $ 1 paid in, even if the recordings produced no income. And the $ 1, in effect, would have cost them nothing because it came from tax refunds produced by the transaction. As a practical matter, therefore, petitioners' "loss" is not attributable to any misrepresentations by Murphy or Johnston but to the Internal Revenue Service audit and denial of the claimed tax benefits. Moreover, *487 a theft loss deduction is allowable under section 165 only if it is shown that the loss is not compensated by insurance or otherwise. Petitioners have not shown that Murphy could not pay any judgment they could obtain against him. In mid-1983, Murphy paid petitioners $ 13,000 as reimbursement of their investment in a Food Source Containers limited partnership and was, presumably, solvent at that time. Petitioners' lawyer, according to the testimony, advised them Murphy was judgment-proof. But petitioners produced no evidence of the factual basis for this opinion or any other evidence showing Murphy was in fact insolvent. On this ground also, petitioners' claimed theft loss deduction has not been established. Ramsay Scarlet & Co. v. Commissioner, 61 T.C. 795, 811-813 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Further, under section 165(e), even if a theft loss were shown, petitioners would have the further burden of showing that the loss was discovered in 1983. The evidence on this point is far from convincing. In fact, as late as July 25, 1983, petitioners *488 paid in $ 1,395 to Sunshine I. There is no convincing evidence that anything occurred between that date and the end of the year that constituted a discovery of the alleged fraud. In fact, it is stipulated that petitioners had no "knowledge of the lack of ownership by Sunshine I, Ltd. during any of the tax years in question." Thus, petitioners have also failed to meet this requirement of the statute. We hold that petitioners have not shown they were defrauded. They sought to obtain a package of tax benefits with attendant risks and that is what they acquired. They have not shown they were theft victims under either the Oregon statute or the Securities Act of 1933. Sections 6653(a), 6653(a)(1) and (2) Additions to Tax for Negligence
Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the underpayment attributable to negligence. For *489 the purposes of the section, negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In attempting to carry the burden of proving respondent's determination erroneous, petitioners introduced the testimony of Kurt Olsen, a 40-year veteran in the stock brokerage business, and Robert Conklin, a lawyer and experienced real estate syndicator. These witnesses testified that an ordinary prudent investor usually does not undertake an independent economic analysis of investment proposals and does not make an independent evaluation of the quality of the management of any business in which he proposes to invest. Instead, he relies heavily upon the recommendations of his broker or other financial advisors. Based on this testimony, petitioners ask us to conclude that they were not negligent within the meaning of section 6653(a)(1) and (2) in underpaying their taxes for the years in issue because they relied on Murphy, their financial advisor. Petitioners' argument misses the point. The section 6653(a)(1) and (2) additions to tax are not imposed *490 for lack of due care in making investments. The statute does not impose a duty on anyone to make only prudent investments. Other revenue laws, however, impose a duty on every taxpayer to file a return declaring his true income, sections 6011 and 6065; and sections 6653(a) and 6653(a)(1) and (2) provide for the additions to tax described above if an underpayment of tax is due to the taxpayer's negligence. Reliance on the advice of an investment broker or promoter who has no tax expertise does not show due care in the preparation and filing of a tax return. We do not think petitioners showed due care when they eagerly entered the tax paradise offered by Murphy. Under his scheme, their tax refunds for 1978 through 1981 were supposed to relieve them from all income taxes for those years and provide funds in excess of the amount of their Sunshine I investment. The tax benefits were to be worth a minimum of $ 4.20 for each $ 1 of the tax refunds they invested. We are persuaded that petitioners knew that Murphy's scheme was too good to be true. They ignored the tax risks described in the synopsis *491 and prospectus. As to the depreciation deduction, they made no effort to see that they had a depreciable interest or any interest at all in the master recordings for which they claimed a deduction. Section 167(g). As to the investment tax credits claim, they took no steps to make sure that the recordings were placed in service in 1981, section 46(c)(1) and (2), or were otherwise entitled to the claim. They simply turned over the preparation of their returns and related papers to an individual designated by Murphy who had sold them the scheme. In our opinion, they negligently failed to file a correct return. We hold that petitioners are liable for the sections 6653(a) and 6653(a)(1) and (2) additions to tax. Section 6659 Additions to Tax
Section 6659(a)[6] provides for the imposition of a graduated addition to tax if an individual has an underpayment of tax which is "attributable to a valuation overstatement." Section 6659(c) defines the term "valuation overstatement" to mean a "valuation overstatement if the value of any property, or the adjusted basis of any property, claimed *492 on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." On their 1981 tax return, petitioners claimed an investment tax credit of $ 16,950 by using an adjusted basis of $ 169,500 for the master recordings. They used the same adjusted basis in claiming depreciation deductions. Because "Sunshine I, Ltd. never made a purchase or acquisition of the subject 'master recordings'; and * * * *493 the 'long-term recourse promissory note' and related * * * 'loan commitment' are shams, without economic substance," petitioners' adjusted basis in the recordings was zero. Rose v. Commissioner, 88 T.C. 386, 426 (1987), affd. 868 F.2d 851 (1989); Zirker v. Commissioner, 87 T.C. 970, 976-980 (1986); McCain v. Commissioner, T.C. Memo. 1987-285, affd. without opinion sub nom. Estate of Secoy v. Commissioner, 869 F.2d 1498 (9th Cir. 1989). Clearly, therefore, petitioners overstated their adjusted basis for the recordings by more than 150 percent and the addition to tax applies. Section 6659(e) authorizes the Secretary to waive all or any part of the addition to tax on a showing that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that the claim was made in good faith. Petitioners seek relief under this provision. In support of their argument, petitioners cite many of the same facts they relied upon to show that they suffered a theft loss. We find petitioners' argument *494 unconvincing. The section authorizes the Secretary, not the court, to waive the addition to tax and he has not done so. Surely, they knew they ran the risk of having their income tax returns audited and that the claimed spectacular benefits could not withstand scrutiny. In our view, the evidence establishes neither a reasonable basis for the claimed valuation nor good faith in making the claim. The evidence does not show an abuse of the Secretary's discretion. Additional Interest under Section 6621(c) (Formerly Section 6621(d))
Section 6621(c)(1) provides for an increase in the rate of interest payable under section 6601 with respect to "any substantial underpayment [an underpayment of at least $ 1,000] attributable to tax motivated transactions * * *." Section 6621(c)(3)(A)(i) and (v) defines "tax motivated transactions" to mean, among other things, "any valuation overstatement (within the meaning of section 6659(c))" and "any sham or fraudulent transaction." This provision applies with respect to interest accruing after December 31, 1984, even though the transaction was entered *495 into prior to the section's enactment. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986); Zirker v. Commissioner, 87 T.C. at 981-982. The foregoing discussion of the addition to tax imposed by section 6659 concludes that the disallowed investment tax credit and deductions for depreciation were attributable to a valuation overstatement, section 6621(c)(3)(A)(i). Moreover, as noted above, the parties have stipulated that "Sunshine I, Ltd. never made a purchase or acquisition of the subject 'master recordings'; and that the 'long-term recourse promissory note' and related * * * 'loan commitment' are shams, without economic substance." Section 6621(a)(3)(A)(v). Petitioners are, therefore, liable for the additional interest on the underpayment as provided by section 6621(c)(1). Cherin v. Commissioner, 89 T.C. 986, 1000 (1987); Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner , 864 F.2d 93 (9th Cir. 1989), *496 affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue.↩
2. Petitioners sold their interest in Suburban Estates in 1984 for $ 3,876.70. ↩
3. Petitioners received a refund of the full amount invested in Food Source Containers in 1983.↩
4. SEC. 165. LOSSES (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- * * * (3) except as provided in subsection (h), losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. * * *↩
5. Or. Rev. Stat. provides as follows: 59.135 Fraud and deceit with respect to securities or securities business. It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise: (1) To employ any device, scheme or artifice to defraud; (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or (4) To make or file, or cause to be made or filed, to or with the director any statement, report or document which is known to be false in any material respect or matter. 59.115 Liability of person selling securities unlawfully; recovery by purchaser; limitations on proceeding. (1) A person who sells a security is liable as provided in subsection (2) of this section to a purchaser of the security if the person: (a) Sells a security in violation of the Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration under the Oregon Securities Law; or (b) Sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.↩
6. Sec. 6659(a)(1) and (c)(1) provides: (a) Addition to the Tax. -- If -- (1) an individual * * * * * * has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. * * * (c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).↩